IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| STACY SAUNDERS, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:17-cv-00159 |
| | ) | |
| METROPOLITAN PROPERTY | ) | By:  Elizabeth K. Dillon |
| MANAGEMENT, INC., | ) |        United States District Judge |
| | ) | |
|     Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Stacy Saunders filed this Title VII action, asserting a sex discrimination and harassment claim and a retaliation claim against her former employer, Metropolitan Property Management, Inc. Metropolitan filed a motion for summary judgment, which has been fully briefed and was argued before the court on July 6, 2018. For the following reasons, the court will grant Metropolitan's motion for summary judgment.

I.   INTRODUCTION

In August 2014, both Clayton Carter and Stacy Saunders began working at Metropolitan Property Management, a nonprofit that assists individuals in finding affordable housing, at its Melinda's Melody property. (Pl.'s Dep. Tr. 9, 113, Dkt. No. 70-7.) Carter worked as a maintenance technician; Saunders, as the site manager. (*Id.*) As the site manager, it was Saunders' responsibility to "serve as the liaison between the Management Company . . . and the tenants to handle all onsite issues," as well as "redirect major issues to . . . Corporate Staff." (Job Desc. 2, Dkt. No. 70-12.) Joseph Moore, Metropolitan's director of operations, stated that Saunders performed very well during her 90-day probation period and that she "had the potential to be great" and "showed greatness" in the beginning of her employment there. (Moore Dep. Tr.

70, Dkt. No. 70-2.) Saunders completed various trainings related to supervising and dealing with difficult employees or problems with the office team. (Pl.'s Dep. Tr. 67.) Saunders understood that she could ask her immediate supervisor, Patricia Reddick, and corporate staff if she had any questions regarding employee policies or problems, and they responded promptly whenever she did ask them questions or bring issues to their attention. (*Id.* at 93–95.)

Saunders and Carter were the only two Metropolitan employees who worked onsite at Melinda's Melody. Saunders was Carter's supervisor. (*Id.* at 54.) She did not have the authority to terminate him, but she could write him up and make recommendations with respect to his employment to corporate staff. Nevertheless, Saunders argues that, in practice, Carter would not listen to her directives and refused to recognize her authority as his supervisor. (*Id.* at 148.)

It is undisputed that Saunders and Carter had a volatile working relationship from the beginning; sometimes they got along, but oftentimes they butted heads. The corporate office at Metropolitan fielded complaints, though none concerning behavior of a sexual nature before November 4, 2015, from both Saunders and Carter about each other's work. Whenever Saunders would complain about Carter, corporate staff would hold a telephone meeting with both of them. At least at first, Saunders did not want them to fire him; she simply wanted them to "talk to him." (Pl.'s Dep. Tr. 205.) Saunders testified that eventually, however, she asked twice for corporate staff to find a replacement for Carter because he was failing to get work done; they responded "that they would address the issue, that [they would] review it." (*Id.* at 234.)

In March 2015, Saunders and Carter both received "disciplinary action" forms for clocking each other in and out of work, which the company considers stealing time. (Moore Dep. Tr. 77.) The form stated, "Any further occurrences of clocking . . . any other employee in

2

or out from work will result in termination. We consider this a very serious violation. The company has zero tolerance concerning this offence [sic]." (Disc. Act. Form 2, Dkt. No. 70-16.) Carter signed his form, but Saunders did not sign hers. (*Id.* at 3.)

At the end of July, Saunders wrote a letter of resignation to corporate staff. The letter does not specify a particular reason for the resignation. (Resignation 2, Dkt. No. 70-17.) Saunders' follow-up email to corporate staff regarding the resignation stated: "I truly believe this is the best choice for my life right now," "[I] will fill Clayton in on how to inspect and what to look for," and "I will be on the property today with Clayton to work on inspecting the exteriors of the buildings if you need to reach me." (Resignation Email 2, Dkt. No. 70-18.) Nevertheless, Saunders testified that the real reason she wanted to resign was her worry that she would be fired due to her lack of control over Carter. Saunders testified that, in early July, Moore told her that "any future incidences" between Saunders and Carter would result in them both being terminated. (Pl.'s Dep. Tr. 343–44; Inv. Rep. 3, Dkt. No. 70-32.) Nevertheless, when Saunders was asked, "[p]rior to the resignation that you submitted at the end of July, did anybody tell you, you know, you are on probation, you might be fired, write you up anything like that?", she responded, "No." (*Id.* at 222.) In any event, Moore and Reddick convinced Saunders to stay, and she renounced her resignation a few days later. (*Id.* at 225.)

Despite an apparent lull in problems between Saunders and Carter in late summer and early fall 2015, the problems appeared to pick back up in October. On October 13, Saunders wrote a five-page complaint about Carter's work to corporate staff; on October 19, a three-page complaint. The October 13 complaint stated, "We are getting along fine and he has no idea that I am checking in on his work load and you realize that if he thinks that I am bringing this to your attention all hell will break loose . . . ." (Oct. 13 Compl. 9, Dkt. No. 70-25.) It further stated:

"He is unmanageable, it's not that I don't like him as a person because I do, but as an employee or partner which ever way you want to look at it, he is in his own world." (*Id.*) Neither complaint made any reference to sexual harassment.

On November 2, both Saunders and Carter received "supervisory coaching forms." Saunders' form listed as reasons for supervisory coaching: time management/work schedule, prioritizing, maintaining a professional work environment, delegations of job duties to subordinate, and follow up for unit inspection deficiencies. The form does not detail the ways in which Saunders' performance was deficient in each category; instead, the deficiencies are implied (for example, "Job duties should be delegated to [Carter] daily") (Nov. Coaching Form 4, Dkt. No. 70-27.) The form does note, however: "We were made aware of personal guests being present at the office during work hours. Be sure you are maintaining a professional work environment at all times." *Id.*[1] After receiving such a coaching form, employees were to respond with comments and sign the form. Moore emailed Saunders shortly before 5:00 p.m. on November 2, asking for her and Carter's forms to be returned. (Nov. 2 Email 2, Dkt. No. 70-28.) Saunders stated she did not realize he needed it that same day, and that she would send the forms back in the morning after she had responded to some issues she had. (*Id.*) The following morning, Saunders reported that she was out of work with a sewer back-up and the flu; she was out of work for the next two days.

On November 4, Saunders alleged for the first time that Carter was sexually harassing her. Moore had called Saunders in what appears to be back-and-forth communications between the two of them regarding his request for the form and her sewer back-up. Saunders claims that during this phone call, Moore asked her if she was sleeping with Carter. Moore denies ever

---

[1] Saunders testified that Moore later said he would remove this comment after she clarified the situation to him.

4

asking that question. According to Saunders, although "it wasn't [her] intention initially" to disclose Carter's conduct, "I was offended, truthfully, that he would ask me such a thing, so at that point, I was like, you know what, I'm just going to tell him what's been going on." (Pl.'s Dep. Tr. 277.)

After disclosing, Saunders asked Moore to "please, don't say anything" to Carter, and she communicated to Moore that she wanted to resign. (*Id.* at 278.) Moore asked her to stay, asked her to file a written statement, and offered to help with a protective order. (*Id.* at 278–79.) Saunders explained that she never asked Metropolitan to go forward with the protective order and she never went to the police about Carter because "there was no reason." (*Id.* at 279.) Specifically, she stated: "There is nothing that I could have—no, he wasn't on my property, he wasn't stalking me at work; it was just a matter of sexual advances and a note." (*Id.* at 280; *compare* Compl. ¶ ("Carter would also stalk plaintiff when she was working").) Likewise, although Carter carried guns, Saunders testified that Carter never led her to fear that he would use a gun on her:

> Q. Okay. And again, did Mr. Carter ever threaten you with the guns?
> A. No.
> Q. Did he ever lead you to think that he was going to use the guns on you?
> A. No.

(Pl.'s Dep. Tr. 285.)

Saunders' November 4 written statement, requested by Moore, contains most of the same factual allegations as the complaint.[2] Saunders stated that Carter told her how sexy she was, asked her sexual questions, patted his legs for her to sit on his lap, called her "my woman,"

---

[2] The court notes that Saunders' brief in opposition refers to a number of incidents (such as Carter asking plaintiff to have sex three to four times per week, taking a picture of her buttocks, cat-calling and whistling at her about 20 times, and telling her he was going to "break her," among other incidents), that are detailed in Saunders' deposition testimony but do not appear in the complaint. (Pl.'s Opp'n 2.)

paced outside of a home she was in, and asked if she would have sex with him. (Saunders Nov. 4 Stmt. 3, Dkt. No. 70-29.) Saunders "told him on several occasions that I was flattered but this was not going to happen that we have to work together and I have a daughter only a few years younger than him." (*Id.*) Saunders also complained that Carter showed her a picture of his genitals, and she submitted a post-it note stating "I want to eat your pussy" that Carter had left on her desk.[3] Saunders asserted that she did not complain about sexual harassment before because she was embarrassed and did not think she would be believed, until she "received the note which was solid evidence." (Saunders Nov. 4. Stmt. 3.)

After this phone call with Saunders, corporate staff immediately called Carter, who submitted two written statements. The statements indicated his surprise regarding the allegations and his own allegations, including that Saunders and Carter both flirted with each other often, that Saunders improperly disclosed confidential tenant information, and that Saunders slapped him on the rear end several times. (Carter Stmts., Dkt. Nos. 70-29, 70-30.) In the statements, Carter also claimed that he had never written Saunders any sexual notes, but he later admitted during his deposition testimony that he lied because he was worried about losing his job.

That same morning of November 4, corporate staff posted both positions on Craigslist. According to Moore, he did so because "[w]e didn't know where [the investigation] was going to go. So just based on that being said, we didn't know if somebody was going to resign, if it was going to lead to termination, so it's always best to be—have resumes on file if need be." (Moore Dep. Tr. 50.) Moore placed both Saunders and Carter on paid administrative leave while Metropolitan investigated the complaints. While she was on leave, Saunders took part of a tenant waiting list, which is a handwritten document that tracks applicants, home with her.

---

[3] Saunders testified in her deposition that the note "was ridiculous because corporate was on the property, too, and if they would have seen that we would have both been fired, so I held on to the note." (Pl.'s Dep. Tr. 270–71.)

James Moore, a financial analyst at Metropolitan and Joseph Moore's brother, was assigned to investigate the complaints. James was a chaplain in the Air Force and had experience with helping victims of sexual harassment receive support and services, and he had never met or supervised either party. The documents sought and/or collected during the investigation, which took place from November 4 through November 11, included: statements from both parties; statements from two other employees reporting a flirtatious relationship between Saunders and Carter; documentation of a tenant complaint regarding confidentiality; and photos of Saunders' and Carters' office space. James wrote an investigation report, which recommended that both parties be terminated. (Inv. Rep., Dkt. No. 70-32.)

Joseph Moore made the final decision to terminate both Saunders and Carter, and corporate staff prepared disciplinary action forms for both of their terminations. Moore stated in his deposition that, when he made the decision to terminate Saunders, the "whole timing aspect [of the complaint] did not boast in her favor" because she waited so long to address the issue and that "her own statement . . . gives cause for concern" because she had not communicated the problem as the site manager. (Moore Dep. Tr. 142, 143.)

On November 13, 2015, corporate staff met with Saunders and Carter and advised them that their employment was terminated.[4] The disciplinary action form states the reason for Saunders' termination as "failure to comply with policies & procedures and exhibiting unprofessionalism within the workplace." (Saunders Term. Form, Dkt. No. 70-39.) In

---

[4] Although there is a dispute regarding whether Carter was offered a transfer to another property, the dispute is not material as the evidence demonstrates that Carter was terminated on November 13. (Carter Term. Form, Dkt. No. 70-40.) Carter's termination form mirrors Saunders': it states the reason for his termination as "failure to comply with policies & procedures, and exhibiting unprofessionalism within the workplace," it notes that Carter failed to return the supervisory coaching form, it refers to Carter's ongoing disputes with Saunders and their previous disciplinary history, and it states that his relationship with Saunders, "although disruptive at first turned to a lustful and flirtatious workplace relationship." (*Id.*) The termination form concluded that "it is apparent to corporate management that you both are incapable of providing the standards of professionalism that are required to maintain the continued operations of Metropolitan." (*Id.*)

7

particular, the form lists that Saunders failed to return the supervisory coaching form, and that Metropolitan's investigation of the sexual harassment complaint revealed: a) "through several unanimous [sic] sources . . . the violation of confidential information being shared amongst other tenants and [Saunders'] family members. Numerous tenants came forward that you were frequently absent from the property"; b) that Saunders removed the waiting list from the office; c) that her office was unorganized and files were inappropriately placed and incomplete; d) that it reviewed the countless complaints between Saunders and Carter; and e) that her relationship with Carter "turned to a lustful and flirtatious workplace relationship." The form further states, "Due to the severity of the confidential information being shared you are banned from the property." (*Id.*)

Plaintiff filed an EEOC charge on March 15, 2016, alleging sex discrimination and retaliation. The EEOC issued a notice of right to sue on January 18, 2017.

## II. DISCUSSION

**A. Standard of Review**

Summary judgment may be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." *N & O Pub. Co. v. RDU Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a party's summary judgment motion, the court must "construe the evidence in the light most favorable to" and "draw all reasonable inferences in [the] favor [of]" the nonmoving party. *Adams. v. UNC-Wilmington*, 640 F.3d 550, 556 (4th Cir. 2011). A party

opposing a motion for summary judgment "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). Parties may point to such facts by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

**B. Saunders' Hostile Work Environment Claim Fails Because She Cannot Establish a Basis for Imputing Liability to Metropolitan.**

To prove a hostile work environment claim under Title VII, plaintiff must show that (1) the conduct in question was unwelcome, (2) the harassment was based on gender, (3) the harassment was sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment, and (4) some basis exists for imputing liability to the employer. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009) (citations omitted). With respect to the fourth prong, "[w]ithin the Fourth Circuit, an employer is liable for a sexually hostile work environment created by a supervisor or other employee[5] only when the employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action." *Lacasse v. Didlake, Inc.*, 194 F. Supp. 3d 494, 501 (E.D. Va. 2016) (citing *Spicer v. Va. Dep't of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995)). "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct

---

[5] Where the harasser is a subordinate of the plaintiff, some courts outside of the Fourth Circuit have applied a modified negligence standard based on the level of authority held by the supervisor over the subordinate. But in the absence of Fourth Circuit case law to that effect, and given Saunders' assertions about her lack of authority over Carter in practice, the court applies the general coworker standard.

9

harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) (internal quotation and citation omitted).

Metropolitan concedes that the first three prongs are disputed. As to the fourth prong, Metropolitan argues that there is no basis for imputing liability to it because it did not know and had no reason to know of the misconduct until November 4, 2015, when it took immediate and adequate remedial action. Saunders does not argue that Metropolitan should have known about the harassment before her phone call with Moore on November 4.[6] Instead, she argues that, as of November 4, Metropolitan certainly had adequate knowledge, upon which it took prompt but clearly not adequate remedial action: it fired her. Saunders further asserts, without any supporting citations, that "[f]iring the victim is form of continued harassment." (Pl.'s Opp'n 8, Dkt. No. 72.)

With respect to whether Metropolitan knew or should have known, Saunders argued at the hearing that she could not have reported the harassment without making matters "worse" for herself. Saunders cited to *Goad v. N.C. Farm Bureau Mut. Ins. Co., Inc.*, No. 1:16-cv-1332, 2017 WL 6001821, at *3 (M.D.N.C. Dec. 4, 2017) to support this argument. In *Goad*, the court found a question of fact under the fourth prong, where plaintiff had failed to report the harassment to human resources or general counsel, but 1) the plaintiff had repeatedly complained to her supervisor about her coworker's sexual harassment, 2) instead of stopping the harassment, the supervisor "began harassing [plaintiff] himself," and 3) after plaintiff watched another

---

[6] Indeed, in her deposition testimony, Saunders confirmed that Metropolitan "would have no reason to to believe that [she] believed that [she] was being sexually harassed" when she received verbal counseling on July 7, 2015, and that she "did not report anything about sexual harassment or inappropriate comments or things of that nature by Mr. Carter until November of 2015." (Pl.'s Dep. Tr. 346.) Additionally, although Saunders' brief in opposition notes that "[k]nowledge of harassment can be imputed to an employer" in certain circumstances (Pl.'s Opp'n 14), Saunders has not pointed to any facts showing a triable issue as to whether Metropolitan should have known of any harassment before November 4.

10

woman "be[] blackballed" after complaining, her supervisor told her "it would be worse for her if she complained outside the office." *Id.* at *2–3.

The facts here are markedly different. Saunders never complained about sexual harassment to anyone at Metropolitan before November 4, 2015. Saunders testified about her contentious relationship with Carter and that, in July 2015, Moore told her that "any future incidences between the two of you" would result in the termination of both Saunders and Carter. (Pl. Dep. Tr. 333–34.) Nevertheless, Saunders continued complaining—without ever referencing anything of a sexual nature—about Carter. At the end of July, Saunders attempted to resign, but Metropolitan convinced her to stay, whereupon Saunders' complaints continued. On October 13, Saunders wrote a five-page complaint about Carter; on October 19, a three-page complaint. No complaint referred to sexual harassment; indeed, on October 13, Saunders wrote, "[I]t's not that I don't like him as a person because I do, but as an employee or partner which ever way you want to look at it, he is in his own world." (Oct. 13, 2015 Email 9.) There simply is no question of fact in this case regarding whether Saunders' failure to report the harassment was reasonable.

With respect to the remedy, while it is true that "firing the victim is not an adequate remedy" (*id.*),[7] Saunders' arguments gloss over nearly everything that took place between her complaint and her termination. The evidence, viewed in the light most favorable to Saunders, demonstrates that Metropolitan took prompt and adequate remedial action. First, Saunders testified that, when she complained to Moore about the harassment over the phone and told him she wanted to resign, Moore convinced her to stay. He assured her that they would look into the allegations and "take care of it." (Pl.'s Dep. Tr. 278–79.) Second, after asking Saunders to stay

---

[7] To support this assertion, Saunders cites to *EEOC v. Cromer Food Servs.*, 414 F. App'x 602, 608 (4th Cir. 2011) (concluding that employer's actions were not effective remedy because the plaintiff was "worse off" when the remedy was his transfer to a shift that conflicted with his childcare responsibilities and required a greater number of hours but a lower pay rate).

11

and upon receiving Carter's complaints regarding Saunders' alleged sexual harassment of him, Metropolitan placed both parties on paid administrative leave. (Moore Dep. Tr. 188.) This action was remedial in that it "ensur[ed] that Plaintiff had no further potential contact with [Carter]," *Lacasse*, 194 F. Supp. 3d at 502, while ensuring that she was still paid. Third, Metropolitan began its investigation the very same day that Saunders complained. (*See, e.g.*, Carter Statement 2, Dkt. No. 70-30.) Finally, through its investigation, Metropolitan sought and/or collected evidence from plaintiff, from Carter, from other Metropolitan employees, and from tenants. No genuine dispute of material fact exists as to Metropolitan's implementation of prompt corrective measures.

Ignoring this, Saunders essentially asks the court to collapse her hostile work environment claim into her retaliatory discharge claim by concluding that Saunders' termination constitutes continued harassment. Neither the case law nor the record in this case supports such reasoning. Because Saunders cannot establish a basis for imputing liability to Metropolitan, her hostile work environment claim fails as a matter of law.

**C. Saunders' Retaliation Claim Fails Because She Cannot Demonstrate That Metropolitan's Reasons for Terminating Her Were Pretextual.**

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018) (internal quotations and citation omitted). If a plaintiff establishes a prima facie case of retaliatory discrimination, the burden then shifts to the employer "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). If the employer makes this showing, the burden shifts back to the plaintiff to demonstrate

that the employer's purported non-retaliatory reasons "were not its true reasons, but were a pretext for discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (internal quotation marks and citations omitted). In evaluating pretext, courts are not to act as "a kind of super-personnel department weighing the prudence of employment decisions." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 206 (4th Cir. 2016) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

Assuming that Saunders can establish a prima facie case of retaliatory discharge, she cannot demonstrate that Metropolitan's stated reasons for terminating her were pretextual.[8] Saunders offers four arguments as to why Metropolitan's reasons were pretext for discrimination. First, Saunders points to the compliments and positive feedback she received at Metropolitan before she complained about harassment. But positive feedback does not somehow cancel out negative feedback. (*See, e.g.*, March 2015 Disciplinary Coaching 2, Dkt. No. 70-16; Nov. 2015 Supervisory Coaching 4, Dkt. No. 70-27.) Saunders acknowledges this negative feedback but invites the court to sit as a super-personnel department, which it cannot do. *See Sharif*, 841 F.3d at 206. For example, Saunders argues that, although the November 2 form noted that "Saunders need[ed] to prioritize her office duties," this was not her fault because "she was trying to do Carter's job too." (Pl.'s Opp'n 19). And with respect to her and Carter's March discipline for clocking each other in and out, Metropolitan should not have considered it "'stealing' time [because] it was actually just the opposite—she saved Metropolitan time." (Pl.'s Opp'n 23.) Nor does earlier positive feedback negate the performance and conduct problems

---

[8] Metropolitan first argued that Saunders cannot establish a causal connection sufficient to satisfy a prima facie case because of the performance issues she experienced throughout her time at Metropolitan and the misconduct discovered in the investigation. (Def.'s Mot. 26, Dkt. No. 70.) Citing to *Taylor v. Rep. Servs., Inc.*, 968 F. Supp. 2d 768, 798 (E.D. Va. 2013), Saunders responded that the close temporal proximity between her complaint and her termination is sufficient. Metropolitan did not attempt to rebut this argument in its reply.

13

Metropolitan later discovered and stated as reasons for termination. *See Supinger v. Virginia*, 259 F. Supp. 3d 419, 440 (W.D. Va. 2017) (concluding that plaintiff failed to present evidence creating an inference of pretext as to the employer's "straightforward explanation that [he] was terminated as a result of the information discovered in the investigation").

Second, Saunders argues that the reasons stated for discharge in her termination letter—her failure to return the coaching form, tenant confidentiality complaints, her removal of the waiting list from the office, and the disorganization of the office—are pretextual, post-hoc explanations. But Saunders' own testimony belies this argument. Saunders testified that she knew that she was supposed to sign and return the coaching form. (Pl.'s Dep. Tr. 265.) As to the confidentiality complaints, Metropolitan attached documentation of one such tenant complaint, that "all of [the tenant's] personal information," such as "her income financial status and her pending complaint," were "shared with another tenant here." (Tenant Compl. 2, Dkt. No. 70-33.)[9] As to the removal of the waiting list, when asked whether documentation including "something about a tenant . . . is prohibited from leaving the office," Saunders responded, "It should stay in the office, yes." (*Id.* at 211.) When asked whether "anybody working at Melinda's Melody [is] supposed to take any of the documentation out of the office," Saunders responded "No . . . [f]or confidentiality reasons." (Pl.'s Dep. Tr. 210–11.) Saunders then testified that if tenant confidentiality is not maintained, "you could be fired" as a result. (Pl.'s Dep. Tr. 143.) Finally, Saunders argues that the exhibit pictures of her office show that the files are organized, whereas Metropolitan cites to the pictures as examples of disorganized filing. (Photos 2–7, Dkt. No. 70-36.) The resolution of this issue—indeed, of Saunders' arguments as

---

[9] At the hearing, the court noted that the complaint does not state the source of the leak of confidential information. Metropolitan responded that its understanding was that the complaint had to concern Saunders, who was the only person onsite with access to such information.

to each reason in the termination letter—turns only on whether Metropolitan's employment decisions were wise, which is not for the court or for the jury to decide. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (emphasizing that it is not for the court or jury to "decide whether the reason [for the termination] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination"). She has not presented evidence from which a reasonable jury could conclude these reasons were false and a pretext for retaliation.

Third, Saunders asserts that Metropolitan attempted to "manufacture evidence to cover its tracks" because "Carraway created a write-up *after* Saunders' employment was terminated and backdated it."[10] (Pl.'s Opp'n 23–24.) To support this argument, Saunders submits an unsworn handwriting expert's report that is not supported by an affidavit or deposition testimony and which the court cannot properly consider at summary judgment. *See Edens v. Kennedy*, 112 F. App'x 870, 877 (4th Cir. 2004) (citation omitted).

Finally, Saunders argues that "the lack of investigation" into Saunders' complaint demonstrates pretext. (Pl.'s Opp'n 24.) Unlike in *Taylor*, where human resources did not investigate the employee's complaints of retaliation and discrimination as a result of her sexual harassment allegations but instead "looked into whether [she] left work early on Friday," 968 F. Supp. 2d at 800, Metropolitan investigated Saunders' complaint of sexual harassment. (*See, e.g.*, Carter Stmt. 2, Dkt. No. 70-30; Reed Stmt. 2, Dkt. No. 70-34; Quesenberry Stmt. 2, Dkt. No. 70-35.) An inference of pretext does not materialize simply because the investigation uncovered performance and conduct issues. *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) ("[A]

---

[10] For its part, Metropolitan argues that "[t]he native email relating to this verbal coaching that Carraway gave to Plaintiff along with its metadata (and Plaintiff's reply thereto) was produced to Plaintiff and is in her possession." (Def.'s Reply 11 n.5.)

complaining worker [under Title VII] is not thereby insulated from the consequences of insubordination or poor performance.").

Saunders has failed to offer evidence either creating the inference of pretext or suggesting that she was terminated because of her sexual harassment complaint. *See Hill*, 354 F.3d at 285. Thus, she has failed to show that Metropolitan's proffered reasons were pretext for retaliation, and her claim fails as a matter of law.

### III. CONCLUSION

For the reasons stated above, the court will grant Metropolitan's motion for summary judgment. An appropriate order will follow.

Entered: August 3, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge